**Gen. 23]** 23

## TESTAMENTARY LAW

### ORPHANS' COURT — EXTENT OF SUPERVISORY POWER OF COURT OVER THE REGISTER OF WILLS

May 13, 2013

*The Honorable Nancy C. Phelps*
*The Honorable Judith L. Duckett*
*Orphans' Court for Anne Arundel County*

You have asked us what authority an orphans' court has over the register of wills, whose duties include serving as the clerk of court for the orphans' court. You have asked us to describe that authority with regard to the register's conduct as the clerk of court and with regard to personnel decisions within the register's office.[1]

This is not the first time this Office has been asked to opine about the relationship between the orphans' courts and the registers. In 49 *Opinions of the Attorney General* 520 (1964), Attorney General Thomas B. Finan answered what appears to be at least one of the questions you pose here: "[T]o what extent is a Register of Wills subject to control and direction by the Orphans' Court of the county which he serves, with regard to the duties incident to his position as Clerk of the Orphans' Court?" We reiterate the general conclusions reached in the earlier opinion, namely, that the orphans' court's authority over the register of wills is analogous to the authority of a court of law over the clerk of court who assists it in administering its docket. Accordingly, the orphans' courts, like circuit courts, have the power to effectuate their jurisdiction, enforce their orders, and punish contempts. Theoretically, and in extraordinary circumstances, the orphans' court's power of contempt may be exercised as to a register, but only with respect to the register's performance of clerical duties in connection with the administration of estates

---

[1] In accordance with our established policy, we forwarded your request for an opinion to Chief Judge Bell for his review and concurrence. On January 8, 2013, David R. Durfee Jr., Executive Director of Legal Affairs for the Administrative Office of the Courts, conveyed Chief Judge Bell's concurrence in your request, revised to ask more broadly "what sort of authority an Orphans' Court has to make sure that its orders and decisions are followed by the Register of Wills."

before the court.  The orphans' court has no role in the decision to appoint, retain, discipline, or terminate personnel within the register's office.

# I

# Background

The orphans' courts and the registers of wills are the two constitutionally-created offices that administer the testamentary system in Maryland.  Both offices are elective, both lie within the Judicial Branch, and both have a long and rich tradition of public service reaching back to the early years of the Republic.  The questions you ask, however, require us to focus on the differences between the two offices and the extent to which the orphans' courts have authority over the registers.

### Orphans' Courts

The orphans' courts serve as the probate courts within each Maryland county and the City of Baltimore.  Except in Harford County and Montgomery County, where the circuit court judges sit as an orphans' court, Art. IV, §§ 20, 40, each orphans' court consists of three judges who are elected, Art. IV, § 40(a), serve four-year terms, Art. XVII, § 3, and, in most jurisdictions, are not required to be members of the bar.  Art. IV, § 40(a)-(d); *Kadan v. Board of Sup. of Elections*, 273 Md. 406, 424 (1974).  The time during which the orphans' courts transact business varies by jurisdiction; some courts meet essentially full time, Md. Code Ann., Estates and Trusts ("ET") § 2-106(b) (Baltimore City), others must meet a certain number of days each week, *see*, *e.g.*, ET § 2-106(d) (Prince George's County, three days), ET § 2-106(h) (Anne Arundel County, two days), and still others must, at a minimum, meet "on the second Tuesday" of the even-numbered months.  ET § 2-106(a).  The judges' salaries are paid by the local jurisdiction in which they serve.  Art. IV, § 40(e).

The orphans' courts derive their authority from Article IV, § 40 of the Maryland Constitution, subject to "such changes as the Legislature may prescribe."  Art. IV, § 40; *Savings Bank v. Weeks*, 110 Md. 78, 92 (1909) (stating that, under Article IV, § 40, the Legislature may "make changes in the powers with which the Orphans' Courts were clothed at the time of the adoption of the Constitution, but also confer additional powers upon such tribunals or . . . take from them powers which at such time they possessed").  As current law prescribes,

> The [orphans'] court may conduct judicial probate, direct the conduct of a personal representative, and pass orders which may be required in the course of the administration of an estate of a decedent. It may summon witnesses. The court may not, under pretext of incidental power or constructive authority, exercise any jurisdiction not expressly conferred.

ET § 2-101(a). As reflected in their statutory charge, the orphans' courts "are not courts of general jurisdiction; on the contrary, they are courts of special and limited jurisdiction only . . . ." *Crandall v. Crandall*, 218 Md. 598, 600 (1950).

Within its limited jurisdiction, however, the orphans' court has "extensive powers" to determine issues related to the administration of estates. *Jones v. Jones*, 41 Md. 354, 361 (1875); *see also Kaouris v. Kaouris*, 324 Md. 687, 709 (1991). The orphans' court conducts judicial probate of a will under certain statutorily-defined circumstances: at the request of an interested person; at the request of a creditor when there has been no administrative probate; when the court or the register determines that the petition for administrative probate is "materially incomplete or incorrect in any respect"; or when the will is torn, damaged, or lost. ET § 5-402. The orphans' court may "direct the conduct of a personal representative, and pass orders which may be required in the course of the administration of an estate of a decedent," ET § 2-102(a), and otherwise has full power to "properly administer[] justice within [its] assigned sphere." *Radcliff v. Vance*, 360 Md. 277, 286 (2000); *see also Allen v. Ritter*, 424 Md. 216, 230 (2011). To this end, the orphans' court "has the same legal and equitable powers to effectuate its jurisdiction, punish contempts, and carry out its orders, judgments, and decrees as a court of record with general jurisdiction in equity." ET § 2-103.

### *Register of Wills*

The registers are also elected constitutional officers and, like most orphans' court judges, serve four-year terms. Art. IV, § 41. The manner in which the registers serve and are compensated, however, differs from that which applies to the orphans' courts. Unlike the judges of most orphans' courts, the register is statutorily required to "devote his full working time to the duties of his office." ET § 2-202. And the registers are not paid by the local jurisdictions in which they serve, but are instead paid "from

the fees and receipts of the office" or, if they are insufficient, "from the taxes remitted to the Comptroller . . . by the register." ET § 2-205(d), (e); *see also* 68 *Opinions of the Attorney General* 96, 105 (1983) (describing the registers' arrangement with the Comptroller to use the administrative infrastructure of the Central Payroll Bureau to pay the salaries and expenses of the registers' offices, with any excess reverting to the General Fund).

The registers' functions as to the administration of estates also differ somewhat from those that the orphans courts perform. Whereas the orphans' court oversees *judicial* probate, the register of wills carries out the *administrative* probate of wills when none of the circumstances requiring judicial probate are present. ET §§ 5-301 to 5-303. The register may admit a will to probate, appoint personal representatives, and otherwise "assume due execution of the will." ET §§ 5-302, 5-303. The register's disposition of the estate is final unless a petition for judicial administration is filed within 18 months of the death of the decedent. ET § 5-304. Because administrative probate makes up the vast majority of the testamentary practice within Maryland, we have previously described the register as the "primary supervising authority over the administration of estates." 61 *Opinions of the Attorney General* 893, 905 n.7 (1976).

Furthermore, the register's role is not limited to the administration of estates in the testamentary sense. The registers are also the primary collectors of Maryland inheritance taxes, ET § 7-307(a), in which capacity they work closely with the Comptroller's Office to ensure that tax receipts are appropriately tabulated, accounted for, and conveyed to the General Fund. *See* ET § 2-207; *see generally* 49 *Opinions of the Attorney General* 520.

The register also serves as the clerk to the orphans' court, ET § 2-208(e), "in which capacity he acts as any other clerk of a constitutionally created court in this State." 49 *Opinions of the Attorney General* at 520. As clerk of the orphans' court, the register carries out a number of ministerial duties. The register "shall make out and issue every summons, process, or order of the court," ET § 2-208(e), attend meetings of the court, ET § 2-208(g), "make full and fair entries of court proceedings," *id.*, and "keep a proper docket" of the orphans' court proceedings "similar in every respect to the dockets required to be kept in the offices of the equity courts." ET § 2-208(d).

The register's performance of his or her powers and duties is thus subject to supervision by two different constitutional bodies.

When acting as the clerk of the orphans' court, the register, "in every respect, act[s] under the control and direction of the court as the clerk of a court of law acts under the direction of the court of law." ET § 2-208(e). And yet, while the register must keep the orphans' court's docket, the docket the register keeps is subject to "supervision, examination, and control as ordered by the Comptroller." ET § 2-208(d). With respect to personnel matters, it is the Comptroller, not the orphans' court, who "set[s] the number and compensation of assistant clerks or deputies employed by each register," Md. Code Ann., State Gov't ("SG") § 4-108(a), and "approve[s]" the register's appointment of deputies and clerks.[2] ET § 2-208(b). And yet any vacancy in the position of register is filled by the orphans' court, not the Comptroller. Art. IV, § 41.

### *Anne Arundel County Dispute*

The request for this opinion comes at the same time that a dispute surrounding the termination of the former Chief Deputy of the Register of Wills for Anne Arundel County is unfolding in the Maryland courts and various administrative tribunals. We are aware of the circumstances of that litigation and of reports of conflicts between that county's orphans' court and register of wills related to the litigation. As we have done previously, we will regard such reports as "hypothetical situations," 49 *Opinions of the Attorney General* at 520, and will not address them further.

We must, however, frame the issues involved in the dispute in order to ensure, in accordance with the longstanding policy of this Office, that we do not issue an opinion on any question that is

---

[2] It is our understanding that the Comptroller's authority to "approve[]" the appointment of deputies and clerks within the register's office is exercised to ensure that the registers are filling authorized positions, not to pass judgment on the qualifications of individual candidates. It is also our understanding that the Comptroller does not "control" the manner in which the registers docket probate cases. Although we have not been apprised of the reason why the Comptroller has exercised his statutory authority in this limited manner, we note that doing so minimizes the risk that the Comptroller's role would intrude upon core judicial functions and thus offend constitutional principles of separation of powers. *See* Maryland Declaration of Rights, Article 8; *see also* 77 *Opinions of the Attorney General* 147, 166-67 (1992) (Secretary of Personnel "cannot exercise her authority to determine which employees are eligible to receive overtime in such a way as to interfere with the core functions of the judicial or legislative branches.").

the subject of current or imminent litigation. To that end, we note that, on December 19, 2011, the terminated employee filed a complaint with the Secretary of the Department of Budget and Management pursuant to the Maryland Whistleblower Law applicable to Executive Branch employees. *See* Md. Code Ann., State Pers. & Pens. §§ 5-301 to 5-314 (2009 Repl. Vol., 2012 Supp.). The Department referred the matter to the Office of Administrative Hearings ("OAH"), which, on July 2, 2012, issued a final administrative decision dismissing the complaint on the grounds that the employee was not an Executive Branch employee and, thus, could not avail herself of the procedures available under the Maryland Whistleblower Law. *See White v. Register of Wills*, *Anne Arundel County*, OAH Docket No. SPMP-AARW-80-12-090164 (July 2, 2012). On May 7, 2013, the Circuit Court for Anne Arundel County affirmed the OAH decision. *White v. Register of Wills*, No. 02-C-12-171099 (Cir. Ct. for Anne Arundel Cty., May 7, 2013). The conclusions we reach here are not intended to bear on that litigation.

## II

## Analysis

### A.   *Within Their Limited Jurisdiction Over the Administration of Estates, the Orphans' Courts Have the Same Authority and Control Over the Register Acting as the Clerk of Court that Any Court of Law Has Over the Clerk of Court.*

An orphans' court has only a "special and limited jurisdiction," *Crandall*, 218 Md. at 600, and it "may not, under pretext of incidental power or constructive authority, exercise any jurisdiction not expressly conferred." ET § 2-101(a). And yet, within its limited jurisdiction, the orphans' court has the same power to control and direct the register of wills in how to carry out the register's responsibilities as clerk as any court of general jurisdiction has over the clerks who assist it:

> [The register] shall make out and issue every summons, process, or order of the court and, in every respect, act under the control and direction of the court as the clerk of a court of law acts under the direction of the court of law.

ET § 2-208(e). This provision is substantively identical to earlier iterations that have been in place since 1798:

> The register of wills in each county, already or hereafter to be appointed agreeably to the constitution, shall diligently attend each meeting of the orphans court in his county . . . and shall, in every respect, act under their control and direction, as the clerk of a court of law is under the direction of the said court of law . . . .

1798 Md. Laws, ch. 101, subch. 15, § 9; *see also* Md. Ann. Code art. 93, § 290 (1964 Repl. Vol.) ("Each register shall . . . in every respect act under their control and direction as the clerk of a court of law is under the direction of such court of law . . . .").

Based on this longstanding authority, as well as the courts' "visitorial powers" discussed below, we have previously advised that the orphans' court "has general power of supervision over the register to the extent that he or she acts as clerk of the orphans' court or participates in the administration of an estate." 76 *Opinions of the Attorney General* 142, 144 (1991). Although we confirm that advice here, we caution that the extent of the orphans' court's "general power of supervision" is determined largely by the specific role in which the register is acting. We do not here attempt to describe the myriad ways in which specific activities of the register may implicate the orphans' court's powers of supervision. Instead, we will discuss the two areas in which you, and the Administrative Office of the Courts, have expressed particular interest, namely, the powers that an orphans' court has to (1) ensure that its orders and decisions are followed by the register, and (2) review and approve personnel decisions within the register's office. Our analysis is structured accordingly, focusing first on the orphans' courts' general supervision of the registers, and how it has evolved, and then answering the question whether that supervisory authority encompasses personnel decisions within the register's office.

1. **Previous Attorney General Opinions Addressing the Orphans' Court's Authority Over the Register of Wills**

As noted above, this is not the first time this Office has been asked to describe the relationship between the orphans' court and the register of wills. In 49 *Opinions of the Attorney General* 520, the Orphans' Court for Montgomery County asked: "to what extent is a Register of Wills subject to control and direction by the Orphans' Court of the county which he serves, with regard to the duties incident to his position as Clerk of the Orphans' Court?"

*Id.* Then-Attorney General Finan answered the question with respect to three "specific areas of controversy," *id*. at 522, and concluded that the court had the power to require that the register (1) not permit attorneys to "remove original records filed in the office of the Register from the premises," *id*.; (2) maintain a written record of delinquencies in the filing of accounts and inventories by executors and administrators, *id.* at 523; and (3) be "available to the court when summoned by it to answer an inquiry." *Id.* The opinion noted that the court's exercise of its supervisory powers in these respects fell within the "proper performance" of the court's "duty of supervising expedient administration of estates." *Id.*

In 61 *Opinions of the Attorney General* 893, then-Attorney General Burch concluded that the orphans' court had the authority to approve or disapprove a register's appointment of himself as the appraiser of a probate estate under administration. The opinion reached that conclusion despite legislative revisions to the Maryland testamentary law in 1969, which gave the register, and not the orphans' court, the "authority and responsibility for the appointment of appraisers" for probate assets. *Id*. at 893. "[A]lthough the Register is vested with authority over the appointment of appraisers in the context of the probate estate, the Orphans' Court can regulate the exercise of his authority under its visitorial powers over him as clerk of court where specific conduct allegedly offends ethical or legal principles or is otherwise alleged to be improper." *Id.* at 900.

This Office also concluded that the orphans' court had the authority to review the register's appointment of himself as appraiser "[e]ven though the appraising of probate assets is generally regarded as required primarily for the establishment of the value of property subject to inheritance taxes," the collection of which is overseen by the Comptroller. *See id.* at 899. We observed in this respect that "appraisals also have varied significance in determining the allocable shares of the interested persons in the distribution of a decedent's estate." *Id*.

> Since, even under administrative probate, the Orphans' Court is the final authority in passing administration accounts reflecting distributions and disbursements, the appraisal process could properly be viewed as constituting more than a mere step in the tax collection process and the Register in exercising his authority in connection with

the appointment of appraisers over probate
assets could properly be regarded as subject
to the "visitorial power of the judges of the
Orphans' Court."

*Id*. at 899-900; *see also* 37 *Opinions of the Attorney General* 319,
320 (1952) (observing that the propriety of the register serving as
an appraiser for a fee was "a matter for determination not by the
Comptroller or by this office but by the Orphans' Court"). In
these and other respects, we have previously described the
register of wills as "an adjunct" of the orphans' court, with
respect to which "the Court may give approval or disapproval to
certain of the practices, just as other Courts pass upon practices in
the respective clerk's offices—which practices affect the
administration of justice in the Court." 21 *Opinions of the
Attorney General* 564, 567 (1936). office.

### 2. The Orphans' Court's "Visitorial Powers" and Their Repeal in 1990

The conclusions we reached in these two prior opinions were
based squarely on the fact that the orphans' court had "visitorial
power" over the register of wills when the latter was acting as a
clerk of court or otherwise participating in the administration of
probate. At the time we rendered these prior opinions, Article IV,
§ 10—which applied to the registers through what is now § 2-
208(e) of the Estates and Trusts Article, *see* former Md. Ann.
Code art. 93, § 290 (1957)—provided that the clerks of all
constitutionally-created courts "shall be subject to the visitorial
power of the Judges of their respective Courts, who shall exercise
the same, from time to time, so as to insure the faithful
performance of the duties of said officers . . . ." Section 10 also
provided that each court must make "rules and regulations as may
be necessary and proper for the government of said clerks, and for
the performance of the duties of their offices . . . ."[3] *See* 49

---

[3] The former text of Article IV, Section 10 provided in full:

The clerks of the several Courts, created, or
continued by this Constitution, shall have charge
and custody of the records and other papers, shall
perform all the duties, and be allowed the fees,
which appertain to their several offices, as the
same now are, or may hereafter be regulated by
Law. And the office and business of said clerks,
in all their departments, shall be subject to the

(continued . . .)

*Opinions of the Attorney General* at 521-22. As the Court of Appeals stated in *Peter v. Prettyman*:

> It is expressly stated that this visitorial power is given for the purpose of securing the faithful performance of duty. The law imposes certain duties on the clerks and requires a bond from them for their faithful performance. To more certainly insure the proper discharge of their duties thus required of them by the law, the Judges are, by the Constitution, given power not only to supervise them, but to prescribe regulations and rules necessary to secure the prompt and efficient discharge of their duties.

62 Md. 566, 575-76 (1884).[4] The Court of Appeals observed in *Prettyman* that "[t]he object of the provision was clearly to coerce

> visitorial power of the Judges of their respective Courts, who shall exercise the same, from time to time, so as to insure the faithful performance of the duties of said officers; and it shall be the duty of the Judges of said Courts respectively, to make, from time to time, such rules and regulations as may be necessary and proper for the government of said clerks, and for the performance of the duties of their offices, which shall have the force of Law until repealed, or modified by the General Assembly.

[4] Although "there may be degrees of visitatorial powers," *Insurance Comm'r of Maryland v. Blue Shield of Maryland, Inc.*, 295 Md. 496, 518 (1983), *see also Board of Educ. v. Heister*, 392 Md. 140, 153 n.12 (2006) (observing that the terms "visitorial" and "visitatorial" have been used interchangeably), the visitorial power is generally regarded as a broad, *ad hoc* authority to enter into the offices of another entity, inspect its operations, and regulate its affairs. Historically, the power of visitation arose most frequently in the context of the "sovereign's right of visitation over corporations," which itself "paralleled the right of the church to supervise its institutions and the right of the founder of a charitable institution 'to see that [his] property [was] rightly employed.'" *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 525 (2009) (quoting 1 W. Blackstone, Commentaries on the Laws of England 469 (1765)). "A visitor could inspect and control the visited institution at will." *Id.*; *see also Black's Law Dictionary* (5th ed. 1979) (defining "visitation" as "[i]nspection; superintendence; direction; regulation").

full compliance with all laws imposing duties upon the clerks," *id*. at 576, and, to that end, it was within the power of each court to determine "[*h*]ow the clerks were to perform their duties" and to direct "[t]he method of doing the work . . . ." *Id*. This Office has previously opined that the court's Article IV, § 10 visitorial powers gave it "control over the day-to-day operation of the clerks' offices," 58 *Opinions of the Attorney General* 69, 73 (1973), and "supervision, regulation, and direction of *how* the clerks are to perform their duties." 68 *Opinions of the Attorney General* at 97. For example, we have previously concluded that the courts' control over the operations of the clerks encompassed such things as setting the "working hours" of the clerk's office. 58 *Opinions of the Attorney General* at 73.

The Legislature amended Article IV, § 10 in 1990, repealed the court's visitorial powers, and made other changes that limit the control that circuit courts have over the clerks who serve them. 1990 Md. Laws, ch. 62 (ratified by the voters on November 6, 1990); *cf*. 82 *Opinions of the Attorney General* 125, 127 (1997) (as a result of the 1990 amendments, "the Constitution no longer could be said to create the post of deputy clerk or to subject it to a measure of circuit court control. Rather, the contours of the position were left to the General Assembly (by statute) and the Court of Appeals (by rule) to determine."). Article IV, § 10 now reads:

> (a)(1) The clerks of the Courts shall have charge and custody of records and other papers and shall perform all the duties which appertain to their offices, as are regulated by Law.
>
> (2) The office and business of the clerks, in all their departments, shall be subject to and governed in accordance with rules adopted by the Court of Appeals pursuant to Section 18 of this article.
>
> (b) The offices of the clerks shall be funded through the State budget. All fees, commissions, or other revenues established by Law for these offices shall be State revenues, unless provided otherwise by the General Assembly.

The intermediate appellate court, writing in 1992, observed that, "[a]lthough the Circuit Court, as a whole, once had a 'visitorial' power over the clerk, that power is vested now in the Court of

Appeals . . . ." *Home Indem. Co. v. Killian*, 94 Md. App. 205, 222 (1992).

In addition to repealing the visitorial powers each individual court had over its clerk of court, the 1990 amendments repealed each individual court's power to make rules and regulations applicable to the clerks of court. The circuit courts were previously empowered to make "such rules and regulations as may be necessary and proper for the government of said Clerks, and for the performance of the duties of their offices." Former Art. IV, § 10 (1981 Repl. Vol., 1989 Cum. Supp.). The 1990 amendments removed that authority and instead gave the Court of Appeals the authority to adopt generally applicable rules governing "[t]he office and business of the clerks, in all their departments." The Court of Appeals has done so, and those rules now govern the interaction between the courts and the clerks who serve them. *See* Rules 16-302 to 16-309.

At the same time the Court of Appeals promulgated uniform rules applicable across the judiciary, it repealed virtually all of the local rules that had been adopted by the circuit courts. *See* Rule 1-102 (allowing the adoption of circuit and local rules on only five topics); Rule 6-102 ("Except as otherwise provided in Rule 1-102, all circuit and local rules regulating matters in the orphans' courts or before the registers of wills are repealed and no circuit or local rules regulating such matters shall be adopted."). In this respect, too, the 1990 amendments reflected a shift of control over the clerks, from the circuit court to the Court of Appeals and its Chief Judge, as "administrative head" of the court system. Art. IV, § 18(a), (b)(1).

The 1990 amendments altered the relationship between the courts and their clerks in another way as well. Prior to 1990, Article IV, § 26 of the Maryland Constitution specifically gave individual courts a significant role in the personnel decisions within the clerks' offices:

> The clerks shall appoint, subject to the confirmation of the Judges of their respective Courts, as many deputies under them, as the Judges deem necessary, to perform, together with themselves, the duties of the office, who shall be removable by the Judges for incompetency, or neglect of duty, and whose compensation shall be determined by law.

Former Art. IV, § 26 (1981 Repl. Vol.); *see* 59 *Opinions of the Attorney General* 84, 85 (1974) (observing that "the power of removal is vested solely in the Judges"); *see also State use of Smith v. Turner*, 101 Md. 584, 590-91 (1905) (concluding that the clerk cannot appoint a deputy clerk "without the approval of the Judge of his Court, nor can he retain him if found by the Judge to be incompetent or negligent").  As a result of the 1990 amendments, however, Article IV, § 26 now provides that "[d]eputy clerks and other employees of the office of the clerk shall be appointed and removed according to procedures set by law."

As part of the statutory and constitutional changes enacted in 1990, § 2-505(b) of the Courts Article was amended to provide that "[t]he procedure for appointment and removal of personnel in the clerk's office shall be as provided by rules adopted by the Court of Appeals" and that the Court would have the authority to determine by rule whether personnel in the clerks' office are to be within the State Personnel Management System, subject to the authority of the Secretary of Personnel, "or in the personnel system of the Judicial Branch."  Former CJP § 2-505(b) (1989 Repl. Vol., 1990 Supp.).  The Court of Appeals elected to establish its own personnel system and promulgated rules providing that the "standards and procedures for the selection and appointment . . . promotion, reclassification, transfer, demotion, suspension, discharge or other discipline" of clerks' office employees shall be developed by the State Court Administrator, subject to the approval of the Court of Appeals.  Rule 16-301(d) (formerly Rule 1212); *see* 79 *Opinions of the Attorney General* 29, 29-30 (1994) (discussing the circumstances surrounding the promulgation of the rules governing the judiciary personnel system).  With the adoption of the personnel system under Rule 1212 and the procedures developed and adopted pursuant to that rule, the circuit court clerks' offices became subject to uniform personnel procedures approved by the Court of Appeals.  *See* 79 *Opinions of the Attorney General* at 29-30 (observing that, as a result of the 1990 amendments, "the offices and business of the clerks, including the appointment and removal of their deputies and employees, became subject to rules adopted by the Court of Appeals").

Because the employees of the circuit court clerks' offices, with one exception, are subject to the judiciary's personnel system, if an employee of a clerk's office fails to perform assigned duties satisfactorily, the employee may be subject to

disciplinary action, but may no longer be removed by the circuit court.[5]  In this respect, the 1990 amendments regularized the relationship between the courts and their clerks, with the terms of engagement set, not by a discretionary, essentially *ad hoc* regulation by the circuit courts, but by the Court of Appeals in accordance with standards uniformly applicable across the judiciary.  Those standards are primarily set forth in three places.  First, Article IV, § 10, discussed above, provides that the clerks "shall have charge and custody of records and other papers and shall perform all the duties which appertain to their offices, as are regulated by Law."  Art. IV, § 10(a)(1).  Second, § 2-201 of the Courts Article elaborates on this constitutional charge and enumerates the clerk's clerical duties.  Those duties generally consist of record-keeping, Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 2-201(a)(1)-(4), (9); issuance of orders and correspondence, (a)(5)-(7); administering oaths, (a)(8); and performing "any other duty required by law or rule," (a)(11).  Finally, the Title 16, Chapter 300 rules apply, providing further guidance on how the clerks carry out their administrative responsibilities and providing more generally that the County Administrative Judge— and not each individual circuit court judge—has the "supervision of all judges, officers, and employees of the court. . . ."  Rule 16-101d.2(i). office.

### 3.    The Orphans' Court's Authority Over the Register of Wills After 1990

Although the 1990 constitutional amendments applied to the clerks and not the registers, § 2-208(e) of the Estates and Trusts Article essentially pegs the supervision of the register to that of the clerks, at least by analogy if not by operation of law.  Accordingly, just as the circuit courts no longer have the broad, discretionary "visitorial powers" over the clerks' offices that they once had, the orphans' courts no longer have "visitorial powers" over the registers.[6]  The Court of Appeals has filled the gap left

---

[5]  The one exception is the chief deputy clerk, who continues to serve at the pleasure of the clerk.  Rule 16-301a.(2); *see* 82 *Opinions of the Attorney General* at 128 (describing the chief deputy clerk as a "singular post").  However, as with the other employees of the clerk's office, the deputy is no longer subject to removal by the circuit court.

[6]  The 1990 repeal of the circuit courts' "visitorial powers" over the clerks renders obsolete the reasoning of our pre-1990 opinions relating to the scope of the orphans' courts' authority over the registers.  *See* 82 *Opinions of the Attorney General* at 125 (regarding whether a deputy

(continued . . .)

by the repeal of visitorial powers by promulgating regulations that govern the operations of the clerks' offices, but it has not done so with respect to the registers.  The Title 6 Rules govern matters in the orphans' courts and before the registers relating to the settlement of decedents' estates, and the Title 7, Subtitle 5 rules govern appeals from the orphans' courts, but both sets of rules provide only limited guidance as to how the registers carry out their role.[7]  *See* Rule 6-108 (providing that the register may not refuse to accept for filing any paper on the ground that it is not in the form mandated by the Rules, so long as it has the necessary certificate of service); Rule 7-505(f) (describing the duties of the registers in transmitting the record on appeal).

The authorities that govern the clerks—Art. IV, § 10; CJP § 2-201, and the Title 16, Chapter 300 Rules—are not directly applicable to the registers.  However, to the extent that those authorities illustrate how a "clerk of a court of law acts under the direction of the court of law," we believe that they describe the manner in which the registers "act under the control and direction" of the orphans' court.  ET § 2-208(e).[8]  We also believe

---

clerk of court may serve as member of the General Assembly and overruling "[p]rior opinions of the Attorney General, which were issued before voter approval in 1990 of changes to Article IV, § 26 of the Constitution and which would mandate a contrary result").

[7]  The Rules Committee, in its recently proposed revision of the Title 16 rules, observed that, "[a]lthough proposed Rule 16-101 refers generally to the administrative duties of the Registers of Wills and the chief judges of the Orphans' Courts, the Rules Committee has not attempted to define in any detail the administrative responsibilities of either. . . .  Because the Orphans' Courts are a Constitutional part of the Maryland Judiciary, it may be advisable at some point for the Court to consider exercising some greater administrative supervision over them . . . ."  178th Report Standing Committee on Rules of Practice and Procedure, Part I, at 4-5 (April 29, 2013).

[8]  We believe the phrase "in every respect" within § 2-208(e) is best interpreted as meaning that the register, when acting as clerk of the orphans' court, is considered "in every respect" to be acting in the same capacity as the clerk of a court of general jurisdiction.  That does not mean, however, that each and every rule applicable to the clerks applies with equal force to the registers.  After all, the statute itself identifies at least one specific duty—maintenance of a docket—that the register performs under the "supervision, examination, and control" of the Comptroller and not the Chief Judge of the Court of Appeals, as Rule 16-305 would provide for circuit court clerks.  *See* ET § 2-208(d).  The

(continued . . .)

that the Court of Appeals, as it has done for the circuit court clerks, has the authority under Article IV, § 18(a) to adopt additional rules that would govern specifically the actions of the registers of wills that are undertaken in the course of administering estates in the orphans' court. *See* Art. IV, § 18(a) (Court of Appeals has authority to "adopt rules and regulations concerning . . . the administration of the appellate courts and in the other courts of this State"). After 1990, then, the Court of Appeals ultimately has the power to determine how the registers perform their duties related to the administration of estates. *Cf. Prettyman*, 62 Md. at 575-76 (describing pre-1990 visitorial powers); 68 *Opinions of the Attorney General* at 97 (same).[9]

Although an orphans' court no longer has the broad visitorial powers it once had over the register who acts as its clerk, it still has "the same legal and equitable powers to effectuate its jurisdiction, punish contempts, and carry out its orders, judgments, and decrees as a court of record with general jurisdiction in equity." ET § 2-103. Within its limited jurisdiction, "it is, by the law, clothed with extensive powers, and

___

rules applicable to clerks conflict with statutory provisions applicable to the registers in other respects as well. *Compare* Rule 16-301d.(3) (appointments of new employees within clerk's office are made in accordance with standards established by State Court Administrator) *with* ET § 2-208(b) (appointments of deputy registers and clerks must be approved by the Comptroller). Finally, the Court of Appeals has promulgated some rules that are specifically applicable to the registers. *See, e.g.*, Rule 6-108. We believe, however, that, in a situation that is not governed by a statutory provision or rule specific to the registers, the rules applicable to the clerks would govern the registers' performance of their clerical duties.

[9] The rulemaking power of the Court of Appeals would not reach the manner in which the registers carry out their responsibilities as the collectors of inheritance taxes. *Cf.* 61 *Opinions of the Attorney General* at 899-900 (suggesting by negative implication that an action by the register that constitutes "a mere step in the tax collection process" would not be subject to the orphans' court's oversight). Although the Comptroller does not administer the inheritance tax, Md. Code Ann., Tax-Gen ("TG") § 2-102, he oversees the registers' collection of inheritance taxes through a number of statutory provisions. *See, e.g.*, TG §§ 2-701 ("The Comptroller shall distribute the inheritance tax revenue to the General Fund of the State."), 7-218(b) (providing for Comptroller's approval of an alternative schedule for payment of inheritance tax); 7-231 to 7-234 (requiring register to report inheritance tax receipts to the Comptroller on a monthly basis).

charged with the performance of very important duties in regard to the administration of the personal estate of deceased persons." *Jones*, 41 Md. at 361. While the orphans' courts may not "exercise any *jurisdiction* not expressly conferred," ET § 2-102(a) (emphasis added), *Crandall*, 218 Md. at 600, they are "empowered to decide such matters as are necessarily incident to the exercise of the *powers* expressly granted them." *Radcliff*, 360 Md. at 286 (quoting *State v. Talbott*, 148 Md. 70, 79 (1925) (emphasis added)). As we have previously observed, the court's power of contempt "is the ordinary means by which courts secure compliance with their orders." 84 *Opinions of the Attorney General* 105, 113 n.7 (1999). The question here is the extent to which that power may be exercised to compel the register to carry out the orphans' court's orders. We think that it may, although within certain limits we describe below.

The judicial power of contempt is rooted in pre-Colonial English law and has been an inherent power of Maryland courts since Independence. *See State v. Roll and Scholl*, 267 Md. 714, 716-17, 726-27 (1973). The power of contempt reflects the recognition that it "is essential to the integrity and independence of judicial tribunals that they should have the power to enforce their own judgment as to what conduct is incompatible with the proper and orderly course of their procedure." *Ex Parte Sturm*, 152 Md. 114, 121 (1927). Although currently codified in § 1-202 of the Courts Article—"A court may exercise the power to punish for contempt of court or to compel compliance with its commands in the manner prescribed by Title 15, Chapter 200 of the Maryland Rules"—the power of contempt is a "common law power possessed, independently of statute, by our courts of constitutional origin." *Sturm*, 152 Md. at 120; *see also Pearson v. State*, 28 Md. App. 464, 480 (1975) ("It is manifest that Courts Art. § 1-202(a) merely recognizes the inherent power of a court to punish for contempt and to compel compliance with its commands."); 5A Md. Law Encycl., *Contempt* § 15 (2001).

A handful of Maryland court decisions reflect that orphans' courts have exercised their contempt powers. *See Attorney Griev. Comm'n v. Kendrick*, 403 Md. 489 (2008); *Attorney Griev. Comm'n. v. Marano*, 306 Md. 792 (1986); *Shapiro v. Ryan*, 233 Md. 82 (1963). However, neither this Office nor any Maryland appellate court has ever had occasion to address the orphans' court's power to hold a *register* in contempt. The reported cases, and our understanding of the practice of the orphans' courts, suggest that the court's contempt power has traditionally been used to compel practitioners, administrators, and guardians to

comply with the court's rules. *See*, *e.g.*, *Kendrick*, 403 Md. at 496-97 (noting that attorney had been held in contempt by orphans' court for failure to turn over estate assets to the successor personal representative); *Marano*, 306 Md. at 796 (noting that attorney had been held in contempt by orphans' court for failure to produce records when serving as personal representative); *Shapiro*, 233 Md. at 90 (overturning finding of contempt on the grounds that the equity court, and not the orphans' court, had obtained jurisdiction over the administrator of the estate at the time the contempt occurred). By contrast, we are not aware of a single instance in which a Maryland orphans' court, or a court of general jurisdiction, has held a register or clerk of court in contempt.

That said, we believe that a court of general jurisdiction could lawfully hold the clerk of court in contempt in the unlikely event that the clerk refuses to carry out a valid court order. *See* 15A Am. Jur. 2d. *Clerks of Court* § 43 (observing that "[a] clerk who fails to obey an order of the court may be guilty of contempt," and citing cases) (2011); 21 C.J.S. *Courts* § 339 (2006) ("As an officer of the court, a clerk of court is generally subject to the court's control and direction in all things necessary to proper administration of the law during its sessions. If the clerk fails to obey an order of the court, he or she may be guilty of contempt."). Although there are few reported cases over the past 200 years in which a clerk of court has been held in contempt, those cases uniformly accept the proposition that the court's power of contempt may be exercised against a clerk who disobeys a valid order of court. *See*, *e.g.*, *In re Lineweaver*, 343 S.W.3d 401 (Tenn. Ct. App. 2010) (upholding authority of juvenile court to hold elected clerk in contempt for failing to produce files of inactive cases); *Ex parte Hughes*, 759 S.W.2d 118 (Tex. 1988) (upholding contempt finding when clerk refused to mail docket to attorneys with cases pending before the court); *Brugh v. Savings and Profit Sharing Pension Fund*, 205 So.2d 322 (Fla. App. 1967) (upholding contempt when clerk, in dereliction of his duties, failed to transmit notice of appeal and record to court); *State ex rel. Caldwell v. Cockrell*, 217 S.W. 524, 529 (Mo. 1919) (upholding contempt finding for clerk's refusal to comply with court order requiring the use of certain forms and observing that "[c]ourts of record of general jurisdiction always have had power to punish as for contempt, their officers, including clerks, for disobeying a judicial order, or otherwise obstructing the administration of justice, or offending the dignity of the court"); *Kruegel v. Williams*, 153 S.W. 903, 903-04 (Tex. Civ. App. 1913) (upholding contempt finding where clerk failed to issue execution

on money judgment, observing, "It is [a] well-settled principle of law that courts have the power to enforce the performance of its orders and decrees through the officers of the court."); *cf. Hall v. Pippin*, 2001 Tenn. App. LEXIS 124 (Tenn. Ct. App. 2001) (denying motion to hold clerk in contempt for failing to file exhibits because court no longer had jurisdiction over the matter); *Crooks v. Maynard*, 732 P.2d 281, 287-88 (Idaho 1987) (declining to address appeal of order in which district court held clerk in contempt for appointing a deputy clerk without that court's approval; also declining to issue writ of prohibition to block the lower court from requiring the reassignment of personnel to assist in the court's functions).

Although an orphans' court has "the same legal and equitable powers to effectuate its jurisdiction, punish contempts, and carry out its orders, judgments, and decrees as a court of record with general jurisdiction in equity," ET § 2-103, the court's power of contempt is necessarily restricted to the court's limited jurisdiction "in regard to the administration of the personal estate of deceased persons." *Jones*, 41 Md. at 361. The orphans' court's power of contempt, however, theoretically could be applied to the action or inaction of a register undertaken in the register's capacity as clerk of court. When acting in that capacity, the register is performing a ministerial duty associated with the court's jurisdiction—things like filing, issuance of summons, process, and orders of the court. ET § 2-208. When performing these functions, the register, like a clerk,

> "acts only as a ministerial officer of the Court." *Corey v. Carback*, 201 Md. 389, 402, 94 A.2d 629 (1953). The law requires the clerk, when requested in writing to do so, to "record any paper filed with his office and required by law to be recorded . . . ." Md. Ann. Code Cts. & Jud. Proc. art., § 2-201(a)(3). Thus, as stated in *McCray v. Maryland*, 456 F.2d 1, 4 (4th Cir. 1972), "[c]lerical duties are generally classified as ministerial . . . and the act of filing papers with the court is as ministerial and inflexibly mandatory as any of the clerk's respon-sibilities." Except as otherwise expressly provided by law, therefore, the clerk has no discretion in the matter and no right to make a judicial determination of whether the paper complies with the Rules or ought to be filed.

*Director of Finance v. Harris*, 90 Md. App. 506, 513 (1992);[10] *see also* 49 *Opinions of the Attorney General* at 522-23 (register's ministerial duties include maintenance of court records and making himself "available to the court when summoned by it to answer an inquiry"); 61 *Opinions of the Attorney General* at 905 n.7 ("[W]e think the Register has no authority to refuse to properly process a paper which is directed to the court and presented to him for filing."). We believe the court's contempt powers reach those ministerial activities that the register performs in his or her capacity as the clerk of court.

The orphans' court's power of contempt, however, would not reach actions the register takes as the primary collector of Maryland inheritance taxes. *See* 6 *Opinions of the Attorney General* 427, 428 (1921) (observing that the register "acts as the agent of the State for the collection of the collateral inheritance tax"); 49 *Opinions of the Attorney General* at 520. The register assesses and collects the inheritance tax due in an estate, TG §§ 7-214, 7-215, and is empowered to make determinations as to what property is included within the taxable estate. *See Siegel v. Comptroller*, 186 Md. App. 411, 414 (2009) (upholding Tax Court decision concluding that register properly determined that *inter vivos* gifts were "in contemplation of death" and thus subject to inheritance tax); *see also supra* n.10 (discussing the Comptroller's oversight of register's collection of inheritance taxes). The orphans' court, by contrast, has no say in how taxes are collected:

> The scrutiny and approval of the Orphans' Court provided for by the Code as to claims made against estates of deceased persons are safeguards applicable and appropriate to claims essentially of a private nature, arising from individual transactions, and of which an administrator cannot be presumed to have knowledge. The merits or validity of private demands may well be inquirable into by the

---

[10] The Court of Special Appeals noted one exception to the requirement that the clerk accept all filings submitted to him: Rule 1-323, which directs the clerk not to accept a paper that lacks an admission or waiver of service or a certificate showing the date and manner of service. *Director of Finance*, 90 Md. App. at 513. Although Title 1 of the Maryland Rules does not apply to the orphans' court or the registers, Rule 1-101(a), Rule 6-108(b) is substantively equivalent to Rule 1-323 and does apply.

Orphans' Court, and its sanction of their amount be given or withheld as seems proper; but the exercise of such a supervision over claims for taxes, which are established by officers specially authorized to impose and collect them, would constitute the Orphans' Court a tribunal to review the action of those conducting the Revenue Department of the State. The acts of such officers cannot depend upon the approval of the Orphans' Court for their validity, but derive their force as proceedings of functionaries clothed with public authority and responsibility for the discharge of their special duties. To devolve on the Orphans' Court the allowance and rejection of such claims would open for their determination the liability of the property assessed, the correctness of the rate and amount of taxation, and all kindred questions.

*Bonaparte v. State*, 63 Md. 465, 471 (1885); *cf.* 58 *Opinions of the Attorney General* at 73-74 (concluding that "the Comptroller has authority over the offices of the Clerks of Court in those matters related to revenue, *e.g.*, collection of fees and taxes and payment of salaries and expenses," but has no "control over the day-to-day operation of the Clerks' offices"). Because the orphans' court has no oversight role to play with respect to tax collection, it may not exercise the power of contempt to compel the register to direct her tax collecting duties.

What is less clear is whether the orphans' court may direct the manner in which the register manages the administrative probate process. Although the orphans' courts have full power to "properly administer[] justice within their assigned sphere," *Radcliff*, 360 Md. at 286, they may not act outside that sphere or enlarge it. ET § 2-102(a) (orphans' court may not "exercise any jurisdiction not expressly conferred"). The relative "spheres" of the orphans' court and register were adjusted in 1969, when the General Assembly revised the testamentary procedure in an effort to "simplify the administration of estates" and eliminate "archaic, often meaningless" provisions of testamentary law, 1969 Md. Laws, ch. 3 (codified at ET § 1-105(a)), which had accreted over the almost two hundred years since Maryland testamentary law was codified in 1798. *See* 1798 Md. Laws, ch. 101; *see generally* Shale D. Stiller and Roger D. Redden, *Statutory Reform in the*

*Administration of Estates of Maryland Decedents*, *Minors and Incompetents*, 29 Md. L. Rev. 85 (1969).

The 1969 amendments were the result of a four-year review process. In 1965, the General Assembly adopted Joint Resolution No. 23, which called upon the Governor to appoint a commission that would submit a proposal for recodifying and revising Maryland's testamentary laws. In that same year, Governor Tawes appointed the Governor's Commission to Review and Revise the Testamentary Law of Maryland, commonly known as the "Henderson Commission" after its Chairman, William L. Henderson, the former Chief Judge of the Court of Appeals. *See Elder v. Smith*, 412 Md. 288, 301 n.11 (2010) (describing origin of commission). The Henderson Commission issued three reports, the second of which, issued on December 5, 1968, is most relevant here.[11] *See* Second Report of Governor's Commission to Review and Revise the Testamentary Law of Maryland, Article 93, Decedents' Estates (1968) ("Second Henderson Commission Report"). In its second report, the commission proposed a "comprehensive restatement" of Maryland testamentary law, *id.* at i, which was ultimately introduced as an Administration measure and adopted by the Legislature with amendments. Stiller and Redden, 29 Md. L. Rev. at 87-88 (describing history of commission and subsequent legislation); *see also Piper Rudnick LLP v. Hartz*, 386 Md. 201, 222-23 (2005) (providing a history of the 1969 changes); *Genesis Health Ventures v. Muller*, 124 Md. App. 671, 675 n.2 (1999) (same).

The Henderson Commission, believing that its mandate did not give it the authority to make major changes in the basic testamentary system, took no position on such issues as the "use of lay judges," "the operation of the Registers' offices on a fee basis," and the "utilization of the Registers as tax collectors." Second Henderson Commission Report at i, 14. The legislation that followed thus is reported to have effected "[n]o major changes." Stiller and Redden, 29 Md. L. Rev. at 90; *Genesis Health Ventures*, 124 Md. App. at 675 n.2 ("The procedures and powers of the Orphans' Courts . . . underwent minimal change.").

---

[11] The commission's first report was issued in 1966 and related solely to the Maryland system of "death taxes." The third report, issued in 1970, related to the method of compensating personal representatives who administer the estates of decedents. *See* Third Report of Governor's Commission to Review and Revise the Testamentary Law of Maryland at 1 (1970).

What did change, however, is the relative roles of the orphans' courts and registers within the system.

Most relevant to our current analysis, the 1969 legislation codified the current "administrative" probate process and gave to the register the power to appoint personal representatives administratively without court approval, whether or not the orphans' court was currently in session. *See* ET § 5-301; Stiller and Redden, 29 Md. L. Rev. at 100-01. Under pre-1969 law, the register could grant letters of administration only when the orphans' court was not sitting, *see* Md. Ann. Code art. 93, § 297 (1964 Repl. Vol.), which had "led to a widespread practice of purposely offering wills for probate during those hours when the Orphans' Courts [we]re not in session." Stiller and Redden, 29 Md. L. Rev. at 100. Thus, while the terms "administrative" and "judicial" probate generally "reflect[ed] traditional practices," *id.* at 100, the formalization of administrative probate was "in effect a withdrawal of jurisdiction from the [orphans'] court." *Schaefer v. Heaphy*, 45 Md. App. 144, 151 (1980). The Henderson Commission itself identified the establishment of administrative probate as one of the two instances in which the newly enacted statute was "intend[ed] to change the existing powers of the Court. . . ." Second Henderson Commission Report at 15; *see also Schaefer*, 45 Md. App. at 151 (same).

The Henderson Commission believed that the codification of administrative probate would, "by raising the importance and dignity of the office of the Register of Wills to a quasi-judicial status, expedite and simplify the administration of estates." Second Henderson Commission Report at 14. It is our understanding that the vast majority of estates are now probated through the administrative system, for which reason we have previously described the registers as the "primary supervising authority over the administration of estates." 61 *Opinions of the Attorney General* at 905 n.7; *see* Allan J. Gibber, *Gibber on Estate Administration*, § 2.26 (5th ed., 2011 supp.) ("Administrative probate is within the exclusive jurisdiction of the register of wills. . . ."). With the assignment of a greater role to the registers within the realm of administrative probate came a concomitant reduction of the orphans' court's role within that realm, and, likely, some limitation on the orphans' court's power of contempt with regard to that function of the registers.

This is not to say that the orphans' courts have no role to play within administrative probate. As we have previously observed, "the distinction between administrative and judicial probate exists only with respect to the procedure for appointment

and qualification of the personal representative. Once the appointment process has been completed, there is no difference thereafter in probate procedure." 57 *Opinions of the Attorney General* 566 (1972). Thus, even when the register opens the estate and appoints the personal representative, the court reviews and approves periodic accountings, Rule 6-417(e), and may institute judicial probate if the petition for administrative probate "is materially incomplete or incorrect in any respect," ET § 5-402(c), or if, upon request for an interested person, the court finds that there was "fraud, material mistake, or substantial irregularity in the prior probate proceeding." ET § 5-304(b)(3); *see also* 61 *Opinions of the Attorney General* at 899 (observing that, "even under administrative probate, the Orphans' Court is the final authority in passing administration accounts reflecting distributions and disbursements"). The Court of Appeals has also "long recognized the power of the Orphans' Courts to correct errors," for example, to revoke letters of administration, abrogate and modify orders, re-open the administration of an estate, refund money to the estate, or reduce the amount of a commission. *Radcliff*, 360 Md. at 287-88. Thus, even though the General Assembly granted the register arguably "exclusive" authority to initiate administrative probate, the orphans' court retains the authority to determine how the estate ultimately is administered.

Whether a particular action of the register falls within the orphans' court's sphere of authority, and thus potentially would be subject to the orphans' court's power of contempt, is necessarily a fact-dependent determination that we cannot make within the context of this opinion. We note, however, that the orphans' court has other ways to effectuate its decisions— approval of accountings, instituting judicial probate, correcting errors—that are better suited to the statutory scheme than holding the register in contempt. That scheme, particularly after the 1969 amendments, envisions that the orphans' courts and the registers would collaborate in the administration of estates, not that one would dictate to the other.

In addition to the limitations discussed above,[12] other considerations similarly caution against holding the register—a

---

[12] There are, of course, generally applicable limitations on the exercise of the power of contempt that would apply to the orphans' courts to the same extent that they apply to courts of general jurisdiction. Title 15, Chapter 200 of the Maryland Rules, for example, restricts the manner in which the power of contempt may be exercised. Generally speaking, the court must issue a show cause order that is

(continued . . .)

constitutionally-created, elected officer—in contempt. For example, we have previously observed that the register's clerical obligations to the orphans' court may not be construed or enforced in a manner that would disrupt the many other functions of the position. *See, e.g.*, 49 *Opinions of the Attorney General* at 523 (concluding that, due to the register's other responsibilities, the register need not be physically present during all meetings of the orphans' court). Given the considerable overlap that may occur between the register's tax-collection and estate responsibilities, *see* 58 *Opinions of the Attorney General* at 73, the court must exercise great care to ensure that its vindication of its jurisdiction does not have collateral consequences for the public fisc.

With these principles in mind, we have previously advised that disputes between competing constitutional officers are "perhaps most appropriately worked out among the parties." 69 *Opinions of the Attorney General* 57 n.1 (1984) (addressing the Comptroller's refusal to authorize funding for deputy clerks that the court ordered the clerk to hire). We repeat that advice here and echo the admonition of the Florida District Court of Appeal, when faced with a dispute between a judge and clerk that resulted in a finding of contempt:

> Although unnecessary to this opinion and unsolicited by the parties, we feel compelled to make the following observation. Because our judicial system is under constant assault

---

"reasonably definite, certain, and specific so that the party may understand precisely what conduct the order requires." 5A Maryland Law Encycl., *Contempt* § 12 (2001). And as several Maryland cases have made clear, an adjudication of contempt will not be sustained when the court order is "void for lack of jurisdiction of the court to pass the order. . . ." *See, e.g.*, *Shapiro*, 233 Md. at 86-87. In such circumstances, the finding of contempt will be overturned on appeal, *id.*, or may be preemptively challenged through the filing of a writ of prohibition in the circuit court. *See Green v. Nassif*, 401 Md. 649 (2007) (dismissing as moot appeal from writ of prohibition issued to orphans' court to block hearing to remove a personal representative). Finally, the Court of Special Appeals has stated that the power of contempt must be used, not to "protect the personage of the judge from real or imagined injury to his pride or dignity, but to assure the proper conduct of the orderly administration of justice over which the judge has been designated to preside." *Thomas v. State*, 21 Md. App. 572, 578 (1974); *see also Roll and Scholl*, 267 Md. at 732 (abuses of the power "must be guarded against").

> from many sources and for many reasons,
> some valid, some invalid; and because
> actions such as this one heap further criticism
> upon our judicial system, however good the
> intention of the parties, we suggest that the
> parties here, as well as those finding
> themselves in similar situations, hereafter
> strive to work out internal disputes with this
> thought in mind—will the action I take be
> beneficial to the efficient and economical
> administration of justice; will it help build a
> better judicial system.

*Corbin v. Slaughter*, 324 So.2d 203, 204 (Fla. Dist. Ct. App. 1975) (reversing issuance of writ of prohibition blocking county judge's show cause order to hold clerk in contempt for refusing to provide the judge with the names of the deputy clerks assigned to him within a specified time).

In sum, orphans' courts, like circuit courts, may effectuate their jurisdiction, enforce their orders, and punish contempts. As to the register, however, the contempt power is limited by the fact that not all of the register's functions fall within the orphans' court's limited jurisdiction. The court's power is also limited by the extraordinary nature of contempt, which is rendered particularly extraordinary in light of the other remedies available to an orphans' court.

### B.    The Orphans' Courts Do Not Have the Authority to Appoint, Discipline, or Terminate Employees Within the Office of the Register.

Although neither this Office, nor any Maryland court, has had occasion to address the orphans' court's role in personnel matters within the register's office, we conclude that it has no such role to play. Section 2-208(b) of the Estates and Trusts Article explicitly places the power to approve the register's appointments in the Comptroller, not the orphans' court:

> [The register] shall appoint deputies and
> clerks required for the efficient operation of
> his office. Appointments and compensation
> of deputies and clerks shall be approved by
> the Comptroller. When qualified, every
> deputy shall have the power and authority to
> act in the place of the register and every act

performed by a deputy shall have the force
and effect as if performed by the register.

*See also* SG § 4-108(a) ("The Comptroller shall set the number and compensation of assistant clerks or deputies employed by each register of wills."). Former Article 93, § 306 similarly gave the Comptroller a role to play with respect to personnel decisions within the register's office:

The Comptroller shall, from time to time, limit and fix the number and compensation of assistant clerks or deputies to be employed by any such register, and . . . such registers of wills are hereby authorized to appoint such assistant clerks and deputies . . . .

Md. Ann. Code art. 93, § 306 (1964 Repl. Vol.). Neither provision provides any role for the orphans' court in the appointment or approval of deputy registers and clerks. Inasmuch as the court "may not, under pretext of incidental power or constructive authority, exercise any jurisdiction not expressly conferred," ET § 2-102(a), we conclude that the orphans' court has no direct role in the hiring of employees within the office of the register of wills.

Nor does the orphans' court's "control and direction" over the register of wills, provided for at § 2-208(e) of the Estates and Trusts Article, extend to the appointment or termination of staff within the register's office. As discussed above, the orphans' court's "control and direction" over the register is limited to the register's performance of the ministerial duties the register performs in her capacity as clerk of the orphans' court. Personnel decisions are neither ministerial nor judicial, but executive. *Boyer v. Thurston*, 247 Md. 279, 295 (1967) ("It seems clear that the appointment of a clerk is not judicial business in the ordinary use of those words, but is in the nature of an executive act . . . ."). Thus, although the orphans' court has the power to fill a vacancy in the position of register of wills, it has no power to do so with respect to the "deputies and clerks required for the efficient operation of" the office of the register of wills. ET § 2-208(b).

## III

### Conclusion

In summary, it is our opinion that the orphans' courts have no role in either the appointment or termination of staff in the

registers' offices. The Legislature has given the registers control over those decisions, subject to the authority of the Comptroller to approve appointments. The orphans' court, as a court of special limited jurisdiction, possesses only those powers statutorily granted to it or necessarily incident thereto, and all such powers are limited to effectuating the orderly and expeditious settlement of estates. Those statutory and inherent powers do not include the power to control the appointment and termination of personnel in the office of the register.

With regard to the orphans' court's authority to ensure that its orders and decisions are followed by the register of wills, we conclude that disputes between the orphans' courts and the registers are best resolved internally. Failing that, we believe the orphans' court has the same power of contempt that a court of general jurisdiction has and, theoretically, that it may exercise that power against the register. The power may be used, however, only to direct the register's performance of clerical duties in connection with the administration of estates; it may not be exercised with respect to the other functions the registers perform. But given the unseemliness of one constitutional officer sanctioning another, we reiterate that any controversies that may arise between the two officers would be better resolved internally, either through professional cooperation or through the intercession of the Chief Judge of the Court of Appeals.

Douglas F. Gansler
*Attorney General*

Adam D. Snyder
*Chief Counsel*,
*Opinions & Advice*